ORAL ARGUMENT IS NOT YET SCHEDULED

No. 13-1008

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

TNA Merchant Projects, Inc.,
Petitioner,

v.

Federal Energy Regulatory Commission,
Respondent,

Bonneville Power Administration,
Intervenor.

On Petition for Review of Orders Issued by the
Federal Energy Regulatory Commission

OPENING BRIEF OF PETITIONER
TNA MERCHANT PROJECTS, INC.

James K. Mitchell
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006-3401
Telephone:  (202) 973-4241
Facsimile:   (202) 973-4499
E-Mail:        jamesmitchell@dwt.com

*Counsel for TNA Merchant Projects, Inc.,
successor-in-interest to Chehalis Power
Generating, LLC*

Dated:  April 15, 2013

## PETITIONER'S RULE 28(a)(1) CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Petitioner, TNA Merchant Projects, Inc., submits the following certificate pursuant to Rule 28(a)(1) of the Rules of this Court:

(A)     Parties and Amici

In 2005, when the proceeding below was initiated, the parties to that proceeding were Chehalis Power Generating, LLC; Bonneville Power Administration, and the Trial Staff of the Federal Energy Regulatory Commission. TNA Merchant Projects, Inc., the corporate parent of Chehalis Power Generating, LLC, sold its equity interest in Chehalis Power Generating, LLC to an unaffiliated purchaser in September 2008, but succeeded to the rights and interests of Chehalis Power Generating, LLC as a party to the proceeding below.

The only parties to this court proceeding are TNA Merchant Projects, Inc., the Petitioner; the Federal Energy Regulatory Commission, the Respondent; and the Bonneville Power Administration, an intervenor.

(B)     Rulings Under Review

The rulings at issue in this court are the following orders of the Federal Energy Regulatory Commission:

*Chehalis Power Generating, L.P.,* FERC Docket No. ER05-1056-005, Order on Remand issued February 17, 2011 (134 FERC ¶ 61,112 (2011)).

*Chehalis Power Generating, L.P.,* FERC Docket No. ER05-1056-006, Order Denying Rehearing issued November 15, 2012 (141 FERC ¶ 61,116 (2012)).

i

(C)     <u>Related Case</u>

Chehalis Power Generating, LLC, which was the predecessor in interest to

TNA Merchant Projects, Inc., filed a Petition for Review of earlier orders of the

Federal Energy Regulatory Commission in the underlying proceeding in *Chehalis*

*Power Generating, LLC, v. Federal Energy Regulatory Commission,* CADC No.

06-1055.  That Petition for Review was dismissed on motion of the Federal Energy

Regulatory Commission on the basis that the orders at issue were not then final.

When those orders became final, a subsequent Petition for Review of those orders

was filed in *TNA Merchant Projects, Inc. v. Federal Energy Regulatory*

*Commission,* CADC No. 08-1201.  The decision of this Court was published in

*TNA Merchant Projects, Inc. v. Federal Energy Regulatory Commission,* 616 F.3d

588 (D.C. Cir. 2010).

Insofar as TNA Merchant Projects, Inc. is aware, there are no other related

cases, as defined in Rule 28(1)(C) of the Rules of this Court.

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of this Court, this is to advise the Court that TNA Merchant Projects, Inc., the Petitioner, is owned by IPR-GDF SUEZ North America, Inc. (formerly Tractabel Inc.).  In turn, IPR-GDF SUEZ North America, Inc. is owned by International Power, S.A., a Belgian societe anonyme, which is owned by Electrabel S.A., another Belgian societe anonyme.  Electrabel S.A. is owned (99.13%) by GDF SUEZ S.A. ("GDF SUEZ"), a French societe anonyme whose interests are publicly traded.  GDF SUEZ has no corporate parent, and no publicly-held company has a 10 percent or greater interest in GDF SUEZ.

GDF SUEZ is one of the leading energy providers in the world and holds ownership interests in a number of energy related subsidiaries that are active internationally across the entire energy value chain, in electricity and natural gas, upstream to downstream.  In 2005, when the underlying proceeding was initiated before the Federal Energy Regulatory Commission, TNA Merchant Projects, Inc. was the corporate parent of Chehalis Power Generating, L.P., which owned and operated the Chehalis generating facility, an electric generating plant in Chehalis, WA, and engaged in the sale of electricity and ancillary services supplied by that electric generating plant.  Chehalis Power Generating, L.P. was subsequently converted to Chehalis Power Generating, LLC.

The orders under review involve amounts collected under a rate schedule for sale of Reactive Supply and Voltage Control from Generation Sources Service supplied by the Chehalis generating facility.  In September 2008, TNA Merchant Projects, Inc. sold all of its equity interests in Chehalis Power Generating, LLC to PacifiCorp, an unaffiliated Oregon corporation.  However, the terms of the purchase and sale agreement expressly provided that TNA Merchant Projects, Inc. retained all rights to recoveries under specified pending claims including the underlying FERC case that is the subject of this petition for review.

TABLE OF CONTENTS

PETITIONER'S RULE 28(a)(1) CERTIFICATE AS TO
PARTIES, RULINGS, AND RELATED CASE ................................................... i

CORPORATE DISCLOSURE STATEMENT ..................................................... iii

TABLE OF AUTHORITIES ................................................................................ vii

GLOSSARY OF TERMS ..................................................................................... x

JURISDICTIONAL STATEMENT ...................................................................... 1

STATUTORY PROVISIONS ............................................................................... 2

STATEMENT OF ISSUES .................................................................................. 2

STATEMENT OF THE CASE ............................................................................. 3

      A.     The Regulatory Scheme ..................................................... 3

            1. Regulation of Rates and Charges ................................... 3

            2. Unbundling of Rates and Charges for
Transmission and Ancillary Services ............................. 5

            3. Regulation of Reactive Supply Service ......................... 7

            4. Generator Interconnection Agreements ......................... 8

      B.     The Proceeding Below ....................................................... 9

SUMMARY OF ARGUMENT ............................................................................. 14

STANDING ........................................................................................................... 16

ARGUMENT .................................................................................... 17

    I.    The FERC's Finding That Chehalis Should Have Filed a
        Rate Schedule for Supplying Reactive Power to BPA
        Prior to May 2005 is Contrary to the Act .......................................... 17

    II.    The FERC's Orders Finding That Chehalis Should
         Have Filed a Rate Schedule for Supplying Reactive
         Power to BPA Prior to May 2005 are Arbitrary and
         Capricious, and Not Supported by Substantial Evidence ................. 20

         A.    The FERC Has Offered No Rational Basis for
               Its Orders ............................................................................... 20

         B.    The FERC Has Departed From Precedent Without
               Reasoned Explanation ........................................................... 25

    III.    The FERC's Orders Finding That the Proposed Schedule
         is a Rate Change Even Though Chehalis Did Not Have a
         Rate Schedule for Supplying Reactive Power Prior to
         May 2005 are Unreasonable and Contrary to the Act ...................... 31

CONCLUSION .................................................................................. 38

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

TABLE OF AUTHORITIES

COURT CASES

*ANR Pipeline Co.* v. *FERC,* 71 F.3d 897 (D.C. Cir. 1995) …………..…….…...  25

*Alabama Power Co.* v. *FERC,* 220 F.3d 595 (D.C. Cir. 2000)  …………...…..  7, 8

*American Gas Ass'n* v. *FERC,* 595 F.3d 14 (D.C. Cir. 2010)  …………………  20

*City of Anaheim* v. *FERC,* 558 F.3d 521 (D.C. Cir. 2009)  …………….…..….  18

*Exxon Corp.* v. *FERC*, 206 F.3d 47 (D.C. Cir. 2000) …………………………... 21

*Florida Gas Transmission Co.* v. *FERC*, 604 F.3d 636 (D.C. Cir. 2010)  …….... 21

*Florida Power & Light Co.* v. *FERC*, 617 F.2d 809 (D.C. Cir. 1980)  …………. 18

**Greater Boston Television Corp.* v. *FCC*, 444 F.2d 841 (D.C. Cir. 1970) ……. 26

**Middle South Energy, Inc.* v. *FERC*, 747 F.2d 763 (D.C. Cir. 1984) …...  4, 5, 15, 32, 33, 35, 36, 37

*Midwest ISO Transmission Owners* v. *FERC*, 373 F.3d 1361 (D.C. Cir. 2004) ………………………………………………….………… 5

**Montana-Dakota Utilities Co.* v. *Northwestern Public Service Co.*, 341 U.S. 246 (1951)  ……………………………….……………..……… 34

*Moshea* v. *NTSB*, 570 F.3d 349 (D.C. Cir. 2009)  ……..……….….………… 25

*Nat'l Fed'n of Fed. Employees, FD-1* v. *Fed. Labor Relations Auth.,* 412 F.3d 119 (D.C. Cir. 2005) …………………………………….. 26

*New York* v. *FERC*, 535 U.S. 1 (2002) …………….……….……………..…… 5

*Southern California Edison Co.* v. *FERC*, 195 F.3d 17 (D.C. Cir. 1999) …....… 18

ADMINISTRATIVE CASES

*Calpine Construction Finance Company, LP*, 130 FERC ¶ 61,080 (2010) …… 29

*Cargill Power Markets, LLC* v. *Public Service Co. of New Mexico*,
    141 FERC ¶ 61,141 (2008) …………..……………………….………. 19

*Central Hudson Gas & Electric Corp.,* 60 FERC ¶ 61,106; *reh. denied*,
    61 FERC ¶ 61,038 (1992) …………..…………………………….….. 34

*Chehalis Power Generating, LP*, 123 FERC ¶ 61,038 (2008) …….….……..… 6

*Hot Spring Power Company, LP,* 110 FERC ¶ 61,284 (2005) …………..……  28

*\*Hot Spring Power Company, LP*, 113 FERC ¶ 61,088 (2005);
    *order on rehearing,* 115 FERC ¶ 61,027 (2006); *order on
    clarification,* 116 FERC ¶ 61,223 (2006) ………..……..……….  28, 29, 30

*KGen Hinds LLC*, 122 FERC ¶ 61,269 (2008) …………………….…….….  29

*\*Prior Notice and Filing Requirements Under Part II of the
    Federal Power Act,* 64 FERC ¶ 61,139 (1993) …………………. 26, 27, 34

*Southwest Power Pool, Inc.*, 119 FERC ¶ 61,199 (2007) ………………..……… 7

*TransAlta Centralia Generation, LLC,* 111 FERC ¶ 61,087 (2005) …..………11, 25

STATUTES AND REGULATIONS

5 U.S.C. § 706 …………….……….……………….…………………….….. 20

Section 201 of the Federal Power Act, 16 U.S.C. § 824 ……..….……..…… 3

\*Section 205 of the Federal Power Act, 16 U.S.C. § 824d …........ 3, 4, 15, 16, 18,
                                                                    19, 22, 23, 32, 34

Section 206 of the Federal Power Act, 16 U.S.C. § 824e ……….. 3, 5, 16, 22, 34,
                                                                    35, 36

Section 313 of the Federal Power Act, 16 U.S. C. § 825*l* ……………..….…  16

18 C.F.R. § 35.28  ……………………………………………………..……..…… 6

*Promoting Wholesale Competition Through Open-Access*
    *Non-Discriminatory Transmission Services by*
    *Public Utilities,* Order No. 888, 61 Fed. Reg. 21,540 (1996);
    *order on reh'g*, Order No. 888-A, 62 FR 12274 (Mar. 14, 1997;
    *order on reh'g,* Order No. 888-B, 81 FERC ¶ 61,248 (1997);
    *order on reh'g,* Order No. 888-C, 82 FERC ¶ 61,046 (1998);
    *aff'd in part sub nom. Transmission Access Policy Study Group* v.
    *FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd, sub nom. New York* v.
    *FERC*, 535 U.S. 1 (2002)  …………………….…………………………..…… 6, 8

*\*Standardization of Generator Interconnection Agreements & Procedures*,
    Order No. 2003, 68 Fed. Reg. 49,845 (Aug. 19, 2003); *order on*
    *reh'g*, Order No. 2003-A, 69 Fed. Reg. 15,932 (March 26, 2004);
    *order on reh'g,* Order No. 2003-B, 70 Fed. Reg. 265 (Jan. 4, 2005);
    *order on reh'g,* Order No. 2003-C, 111 FERC ¶ 61,401 (2005),
    *aff'd, NARUC* v. *FERC*, 475 F.3d 1277 (D.C. Cir. 2007); *cert.*
    *denied,* 128 S. Ct. 1468 (2008)  …………………………….…… 8, 9, 27, 28

## OTHER AUTHORITIES

*Principles for Efficient and Reliable Reactive Power Supply*
    *And Consumption*, FERC Staff Report, Docket No.
    AD05-1-000 (Feb. 4, 2005)  ………………………..……………….…….. 7, 8

*\*Report of the House Committee on Interstate and Foreign Commerce,*
    H. R. Rpt. No. 1318, 74th Cong., 1st Sess. (1935)  ……..…….…….........…… 19

*\*Report of the Senate Committee on Interstate Commerce,*
    S. Rep. No. 621, 74th Cong., 1st Sess.  (1935)  …………….……………...… 20

Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF TERMS

| | |
|---|---|
| Act | Parts II and III of the Federal Power Act, 16 U.S.C. §§ 824, *et seq.* |
| BPA | Bonneville Power Administration, the transmission owner with which Chehalis is interconnected, and an intervenor in this proceeding. |
| Chehalis | Chehalis Power Generating, LP, the owner of the Chehalis Plant and formerly a subsidiary of TNA Merchant Projects, Inc., the Petitioner herein. |
| Chehalis Plant | A 520 MW gas-fired combined-cycle electric generating facility that is located in Chehalis, WA and is interconnected with the BPA transmission system. |
| Exhibit B | The exhibit to the Interconnection Agreement which sets forth the obligation of Chehalis to follow a voltage schedule and supply reactive power from the Chehalis Plant to BPA. |
| FERC | Federal Energy Regulatory Commission, the Respondent. |
| Interconnection Agreement | Interconnection Agreement between BPA and Chehalis designated as Contract No. 00TX10354, pursuant to which the Chehalis Plant is connected to the BPA transmission system. Exhibit B is part of the Interconnection Agreement. |
| LGIA | Large Generator Interconnection Agreement—the standard form of interconnection agreement prescribed by the FERC in Order No. 2003 for interconnection of electric generation facilities larger than 20 MW to the interstate transmission grid. |

| | |
|---|---|
| Order No. 888 | *Promoting Wholesale Competition Through Open-Access Non-Discriminatory Transmission Services By Public Utilities,* 61 Fed. Reg. 21,540 (1996); *order on reh'g*, Order No. 888-A, 62 Fed. Reg. 12274 (Mar. 14, 1997; *order on reh'g,* Order No. 888-B, 81 FERC ¶ 61,248 (1997); *order on reh'g,* Order No. 888-C, 82 FERC ¶ 61,046 (1998); *aff'd in part sub nom. Transmission Access Policy Study Group* v. *FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd, sub nom. New York* v. *FERC*, 535 U.S. 1 (2002). |
| Order No. 2003 | *Standardization of Generator Interconnection Agreements & Procedures*, 68 Fed. Reg. 49,845 (Aug. 19, 2003); *order on reh'g*, Order No. 2003-A, 69 Fed. Reg. 15,932 (March 26, 2004); *order on reh'g,* Order No. 2003-B, 70 Fed. Reg. 265 (Jan. 4, 2005); *order on reh'g,* Order No. 2003-C, 111 FERC ¶ 61,40 (2005), *aff'd, NARUC* v. *FERC*, 475 F.3d 1277 (D.C. Cir. 2007); *cert. den.,* 128 S. Ct. 1468 (2008). |
| Order on Rehearing | *Chehalis Power Generating, LP,* , Docket No. ER05-1056-000, Order Denying Rehearing, issued Nov. 15, 2012, 141 FERC ¶ 61,116 (2012). |
| Proposed Schedule | Proposed rate schedule for Reactive Supply and Voltage Control from Generation Sources Service from the Chehalis Plant, which was filed by Chehalis at the FERC in the proceeding below on May 31, 2005 as an initial rate schedule. |
| Remand Order | *Chehalis Power Generating, LP,* Docket No. ER05-1056-000, Order on Remand issued Feb. 17, 2011, 134 FERC ¶ 61,112 (2011). |
| Settlement Agreement | Settlement Agreement in *TransAlta Centralia Generation LLC,* FERC Docket No. ER04-810-000, which provided, *inter alia,* for Chehalis to file |

the Proposed Schedule at the FERC as an initial rate schedule.

Transmission provider          An entity that owns, controls, or operates transmission facilities used for the transmission of electricity in interstate commerce and provides transmission service under a tariff through which open access transmission service and interconnection service are offered.

## JURISDICTIONAL STATEMENT

The Petition for Review in this proceeding challenges final orders of the Federal Energy Regulatory Commission (the "FERC") finding that Chehalis Power Generating, L.P. ("Chehalis") was required by Section 205 of the Federal Power Act (the "Act"), 16 U.S.C. § 824d, to have a rate schedule applicable to the supply of reactive power from its Chehalis Generating Plant ("Chehalis Plant") on file with the FERC prior to May 31, 2005.

Although the Chehalis Plant began commercial operation in October 2003, Chehalis did not establish charges for supplying reactive power from the Chehalis Plant until August 2005.  In *Chehalis Power Generating, L.P.,* 112 FERC ¶ 61,144 (2005) (*Chehalis I*), *order on rehearing*, *Chehalis Power Generating, L.P.,* 113 FERC ¶ 61,259 (2005) (*Chehalis II*), the FERC ruled that a rate schedule for the supply of reactive power from the Chehalis Plant that was filed on May 31, 2005 was a "rate change" that was subject to the FERC's suspension and refund authority under Section 205(e) of the Act.  However, this Court vacated those orders and remanded the case to the FERC for further proceedings.  *TNA Merchant Projects, Inc.* v. *FERC,* 616 F.3d 588 (D.C. Cir. 2010) ("*TNA Merchant Projects"*).

The FERC issued an Order on Remand on February 17, 2011.  *Chehalis Power Generating, L.P.,* 134 FERC ¶ 61,112 (2011) (the "Remand Order").

1

Petitioner filed a timely request for rehearing of that order on March 18, 2011.  The

FERC issued an Order Granting Rehearing for Further Consideration on April 18,

2011.  Thereafter, on November 15, 2012, the FERC issued its Order Denying

Rehearing.  *Chehalis Power Generating, L.P.,* 141 FERC ¶ 61,116 (2012) (the

"Order on Rehearing").  The FERC's orders in the underlying proceeding became

final and subject to review when no party sought rehearing.  The Petition for

Review was filed in this proceeding on January 14, 2013.  This court has

jurisdiction to review the Remand Order and the Order on Rehearing under

Section 313 of the Act, 16 U.S.C. § 825*l* (b).

## STATUTORY PROVISIONS

The pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF ISSUES

1.      Whether the FERC acted arbitrarily and capriciously, without rational

basis, and in violation of Section 205 of the Act when it determined that the

interconnection agreement between Chehalis and the Bonneville Power

Administration ("BPA") (the "Interconnection Agreement") was required by

Section 205 of the Act to be filed as a rate schedule for supply of reactive power

service by Chehalis prior to May 2005, even though it did not contain rates for

reactive power service and Chehalis was not proposing to collect charges for such

service prior to that date.

2.      Whether the FERC acted arbitrarily and capriciously, without rational basis, and in violation of Section 205 of the Act, when it determined that the proposed rate schedule for supply of reactive power service filed by Chehalis in the proceeding below in May 2005 (the "Proposed Schedule") was a change in rates that could be suspended and made subject to refund under Section 205(e) of the Act even though Chehalis did not have an initial rate schedule for supply of reactive power service on file and was not collecting charges for reactive power service prior to that date.

## STATEMENT OF THE CASE

### A.    The Regulatory Scheme

#### 1.    Regulation of Rates and Charges

The FERC has jurisdiction pursuant to Parts II and III of the Act over the transmission of electricity in interstate commerce and over the sale of electricity for resale in interstate commerce by public utilities.  16 U.S.C. § 824.  Rates and charges for FERC-jurisdictional services are regulated by the FERC pursuant to Sections 205 and 206 of the Act.  16 U.S.C. §§ 824d, 824e.

Insofar as relevant to this proceeding, Section 205(a) of the Act, 16 U.S.C. § 824d(a), requires all rates and charges for FERC-jurisdictional services, and all rules and regulations affecting or pertaining to such rates or charges, to be "just and reasonable."  Section 205(b) of the Act, 16 U.S.C. § 824d(b), further prohibits

3

public utilities from establishing unreasonable differences in rates and charges for different customers.  Section 205(c) of the Act, 16 U.S.C. § 824d(c), requires schedules showing all rates and charges for FERC-jurisdictional services to be on file with the FERC (*emphasis added*):

> …every public utility shall file with the Commission…schedules showing <u>all rates and charges</u> for any transmission or sale subject to the jurisdiction of the Commission, and the classification, practices, and regulations <u>affecting such rates and charges</u>, together with all contracts which in any manner <u>affect or relate to such rates, charges,</u> classifications, and services.

Section 205(d) of the Act, 16 U.S.C. ¶ 824d(d), requires public utilities to file any changes to their filed rates with the FERC at least 60 days before each change is proposed to become effective.  Finally, Section 205(e) of the Act, 16 U.S.C. § 824d(e), permits the FERC to suspend the effectiveness of a rate change for up to five months beyond its proposed effective date, and to conduct a hearing into the lawfulness of the proposed rate change.  If the rate change becomes effective before any such hearing has been concluded, the FERC may order the utility to refund, with interest, the difference between amounts collected pursuant to the changed rate schedule while the hearing was pending and amounts that would have been collected under rates that were determined by the FERC at the conclusion of the proceeding to be lawful.

In *Middle South Energy, Inc. v. FERC,* 747 F.2d 763 (D.C. Cir. 1984), this Court ruled that although the FERC has authority under Section 205(e) of the Act

4

to suspend the effectiveness of a rate change filing, it has no similar authority

under that section of the Act to suspend the effectiveness of an initial rate schedule,

or to order refunds of amounts collected after the initial rate schedule has become

effective that may be deemed to be excessive.  However, Section 206 of the Act,

16 U.S.C. § 824e, which is parallel to Section 205, authorizes the FERC to

investigate "any rate, charges, or classification demanded, observed, charged, or

collected by any public utility for any" FERC-jurisdictional service.  That section

also allows the FERC to order refunds of charges collected while an investigation

initiated pursuant to Section 206 is pending that are determined, at the conclusion

of such investigation, to be excessive.

### 2. Unbundling of Rates and Charges for Transmission and Ancillary Services

Until 1996, most utilities were vertically integrated entities and "electricity

generation, transmission, and distribution for a particular geographic area were

generally provided by and under the control of a single regulated utility."  *Midwest

ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004).  Sales

of those services were "bundled" and the transmission grid was segmented among

different transmission owning utilities.  *New York v. FERC*, 535 U.S. 1, 5 (2002).

Beginning in 1996, the FERC promulgated a series of regulations designed

to foster development of competitive wholesale bulk energy markets in which

wholesale purchasers would have access to adequate supplies of electric energy at

5

just and reasonable prices.  In its landmark Order No. 888, the FERC required

vertically integrated utilities to "functionally unbundle" their transmission and

generation functions and to provide transmission service to all eligible customers

on a non-discriminatory basis.  *See Promoting Wholesale Competition Through*

*Open-Access Non-Discriminatory Transmission Services by Public Utilities*, 61

Fed. Reg. 21,540 (1996) ("Order No. 888"), *order on reh'g*, Order No. 888-A, 62

FR 12274 (Mar. 14, 1997); *order on reh'g,* Order No. 888-B, 81 FERC ¶ 61,248

(1997); *order on reh'g,* Order No. 888-C, 82 FERC ¶ 61,046 (1998); *aff'd in part*

*sub nom. Transmission Access Policy Study Group* v. *FERC*, 225 F.3d 667 (D.C.

Cir. 2000), *aff'd, sub nom. New York* v. *FERC*, 535 U.S. 1 (2002); *see also* 18

C.F.R. § 35.28; *Midwest ISO*, 373 F.3d at 1364; *Chehalis Power Generating,*

*LP*, 123 FERC ¶ 61,038 at P 2 (2008).  Because certain generation-related

"ancillary services," including reactive supply service, are needed to support and

maintain transmission system operations, the FERC also ordered transmission

providers to offer these ancillary services in open-access transmission tariffs and

required transmission customers either to self-supply these ancillary services or to

purchase these ancillary services from transmission providers.  *See* 61 Fed. Reg.

at 21,580-21,582.

### 3. Regulation Of Reactive Supply Service

This case involves the Proposed Schedule, which was filed by Chehalis pursuant to Section 205(c) of the Act to establish charges for Reactive Supply and Voltage Control from Generation Sources Service from the Chehalis Plant (R. 1 at 10-11).

Electric power consists of two components: (i) "real power," and (ii) "reactive power" (R. 1 at 45; *see also, Southwest Power Pool, Inc.*, 119 FERC ¶ 61,199 at P 28 (2007)).  Real power is the active force that causes electrical equipment to perform useful work, such as lighting homes and operating factory equipment.  Reactive power, in contrast, is a support service used to maintain adequate voltages on the transmission grid when "real" power is transmitted and used by consumers (R 1 at 45-46; *see also*, *Alabama Power Co. v. FERC*, 220 F.3d 595, 596–97 (D.C. Cir. 2000)).  If an electrical signal contains an inappropriate quantity of reactive power, the available real power will decrease, potentially resulting in a brownout or blackout.  *See* FERC Staff Report, Principles for Efficient and Reliable Reactive Power Supply and Consumption, at 19–21 (Feb. 4, 2005), available at http://www.ferc.gov/EventCalendar/Files/ 20050310144430-02-04-05-reactive-power.pdf ("Reactive Power Report").

There are two ways to produce or consume reactive power.  The transmission provider may install capacitors or inductors at points throughout the

transmission system, which can help maintain proper reactive power levels. *See*
Reactive Power Report, at 25. Alternatively, a generator interconnected to the
transmission grid may tune its generation equipment to produce or absorb reactive
power. *See id*. at 40-41. Employing generation equipment in this fashion requires
the generator to invest in infrastructure and "causes heating loss that increases fuel
consumption and demand." *Alabama Power Co.*, 220 F.3d at 597; *see also*
Reactive Power Report, at 39-44. The FERC noted in Order No. 888 that at least a
portion of the reactive power supply needed to support the reliability of the
transmission system must come from generation sources. Order No. 888, 61 Fed.
Reg. at 21,581-21,582.

### 4.      Generator Interconnection Agreements

Although Order No. 888 required FERC-jurisdictional transmission
providers to offer open-access transmission service pursuant to FERC-prescribed
transmission tariffs, it did not impose similar requirements for transmission
providers to connect electric generators to the transmission system. In 2003, the
FERC adopted open-access requirements for interconnection of new generators.
*Standardization of Generator Interconnection Agreements and Procedures*, Order
No. 2003, 68 Fed. Reg. 49,846 (2003); *order on reh'g,* Order No. 2003-A, 69 Fed.
Reg. 15,932 (Mar. 26, 2004); *order on reh'g,* Order No. 2003-B, 70 Fed. Reg. 265
(Jan. 4, 2005)); *order on reh'g,* Order No. 2003-C, 111 FERC ¶ 61,401 (2005),

*aff'd, NARUC* v. *FERC*, 475 F.3d 1277 (D.C. Cir. 2007); *cert. den.,* 128

S. Ct. 1468 (2008).

Order Nos. 2003, *et seq.*, prescribed standard procedures for interconnection

of new generation facilities that are larger than 20 MW to the interstate

transmission grid, and prescribed a form of standard large generator

interconnection agreement ("LGIA") to be used for interconnections between such

generators and facilities of the transmission provider (69 Fed. Reg. at 49,949, *et*

*seq.*).  Section 9.6.2 of that standard LGIA requires each new generating facility to

be capable of providing reactive power within a specified range, and permits the

transmission provider to require the generator to operate its generation facility to

produce or absorb reactive power within that range (68 Fed. Reg. at 49,962).

However, the FERC determined in Order No. 2003 that generators ordinarily

"should not be compensated" for reactive supply service provided under the LGIA

within a specified range (the deadband).  68 Fed. Reg. at 49,891 (P 546).

## B.    The Proceeding Below

In 2005, when the proceeding below was initiated, the Chehalis Plant was

owned and operated by Chehalis.  TNA Merchant Projects, Inc., Petitioner herein,

was the corporate parent of Chehalis.  In September 2008, TNA Merchant Projects,

Inc. sold all of its equity ownership interests in Chehalis to an unaffiliated

purchaser, but retained the right to litigate and receive the proceeds from the

present claim (R. 87 at 3-4).  To avoid confusion in the present review, Petitioner

will continue to refer to Chehalis even though Chehalis no longer has an economic

interest in this Petition.

The Chehalis Plant, which commenced commercial operation in October

2003 (R. 1 at 41), is located within the BPA balancing authority area and is

interconnected to the BPA electric system pursuant to the Interconnection

Agreement (R. 54 at 107, *et seq*.).  Consistent with the standard LGIA prescribed

by the FERC for all new generator interconnections, Exhibit B—Voltage

Schedules and Reactive Power to the Interconnection Agreement ("Exhibit B")

obligates Chehalis to supply reactive power to the BPA transmission system in

accordance with voltage schedules established by BPA (R. 54 at 123).  However,

nothing in the Interconnection Agreement provides for Chehalis to be compensated

for this service.

In 2004, TransAlta Centralia Generation, LLC, which is another independent

generator within the BPA balancing authority area that also has an obligation to

provide reactive power to BPA, filed a rate schedule to receive cost-based

compensation for reactive power service in FERC Docket No. ER04-810-000.

Chehalis and other similarly situated generators intervened in that proceeding.

A Settlement Agreement in that proceeding among BPA, TransAlta, and the

various other generators that had intervened (the "Settlement Agreement")

10

specified procedures for the filing of reactive power service rates by each of the generator settling parties (R. 1 at 15-38).  The Settlement Agreement permitted Chehalis to develop cost-based rates for supplying reactive power to BPA, but provided that Chehalis would not ask to have its rate schedule for reactive power service made effective prior to August 1, 2005 (R. 1 at 25-27).  The Settlement Agreement also explicitly authorized Chehalis to make an initial rate filing with the FERC pursuant to Section 205(c) of the Act for approval of a reactive power service rate for the Chehalis Plant.  The Settlement Agreement was accepted by the FERC without condition or modification in an order dated April 19, 2005.  *TransAlta Centralia Generation, LLC,* 111 FERC ¶ 61,087 (2005).

As permitted by the Settlement Agreement, Chehalis filed the Proposed Schedule with the FERC in Docket No. ER05-1056-000 in May 2005 (R. 1).  Chehalis explained in its rate schedule filing that the proposed rates were being submitted as "initial rates" that are not subject to suspension under Section 205 of the Act, because Chehalis had never sought to charge for this service, and BPA had not been a customer of Chehalis for any purpose (R. 1 at 6).

In *Chehalis I*, the FERC accepted the Proposed Schedule for filing and suspended it for a nominal period, and permitted it to become effective as of August 1, 2005, subject to refund (R. 8 at 6).  In so doing, the FERC stated that it disagreed with Chehalis' characterization of the rate schedule as an initial rate

11

schedule, and held instead that, notwithstanding the Settlement Agreement, it constituted a change in rates (R. 8 at 6 (P 23)).  The FERC further provided for the conduct of an evidentiary hearing in which to determine whether the rates proposed by Chehalis were just and reasonable.  A timely petition for rehearing of that order which was filed by Chehalis was denied by the FERC on December 15, 2005.  See, *Chehalis II* (R. 20).

In an order issued on April 17, 2008, the FERC concluded that the rates in the Proposed Schedule were excessive, and ordered Chehalis to refund to BPA the difference between amounts collected under the Proposed Schedule between August 1, 2005 and September 30, 2006, and amounts that would have been collected during that period under the rates that were determined to be just and reasonable, together with interest calculated in accordance with 18 CFR § 35.19a (R. 81).  A refund report filed by Chehalis on May 30, 2008 shows that Chehalis refunded $3.4 million to BPA pursuant to that order (R. 84).

Chehalis filed a Petition for Review of *Chehalis I* and *Chehalis II* with this Court in which it argued that the FERC's ruling that the Proposed Schedule was a rate change that was subject to the FERC's suspension and refund authority under Section 205(e) of the Act was in error.  In *TNA Merchant Projects,* the Court noted that the FERC had failed to address in *Chehalis I* and *Chehalis II* one of the arguments made by TNA Merchant Projects, Inc.; namely, that a rate schedule

12

cannot be classified as a "changed" rate schedule unless it supersedes a previously-filed initial rate schedule.

During oral argument of the case before this Court, counsel for the FERC argued that even though Chehalis did not have a previously-filed rate schedule for supply of reactive power to BPA, the Interconnection Agreement should have been filed as a rate schedule, and that this was sufficient reason for the FERC to treat the Proposed Schedule as a change in rates. In *TNA Merchant Projects*, the Court rejected this rationale because it had not been included in the FERC's orders. The Court vacated the FERC's orders in *Chehalis I* and *Chehalis II*, but remanded the case to the FERC to provide an explanation for its statutory interpretation of initial rates "if it can."

Given that the only previous "rate" cited by the FERC was the Interconnection Agreement, and that the Interconnection Agreement was not on file at the FERC, the Court indicated that the FERC needed to make at least two findings to support its treatment of the Proposed Schedule as a change in rate schedule (R. 94 at 8-9). First, the FERC was required to find reasonably that Chehalis was required to have filed the Interconnection Agreement as a rate schedule prior to May 31, 2005. Second, the FERC was required to find reasonably that the obligation for Chehalis to file the Interconnection Agreement as a rate schedule was sufficient to cause the Proposed Schedule to be treated as a rate

13

change under Section 205(e) of the Act, even though the Interconnection

Agreement had not in fact been filed as a rate schedule.

In the Remand Order, the FERC concluded that (Remand Order at P 19):

> If the provision of reactive power is a jurisdictional service, and no one in this proceeding denies that it is, then the utility providing this service has an obligation to file a rate governing the provision of this service. In sum, Chehalis should have filed a rate schedule, and on this basis alone it is fair to treat Chehalis's proposed rate schedule at issue here as a changed rate….

> We also do not agree with Chehalis that whether or not a rate schedule was actually on file with the Commission has a bearing on whether a proposed rate is an initial or changed rate. While Chehalis should have filed a rate schedule, its failure to do so did not convert the subsequent changed rate at issue here into an initial rate.

The FERC subsequently denied Chehalis' request for rehearing of the

Remand Order (*see*, Order on Rehearing).

## SUMMARY OF ARGUMENT

The issues remanded to the FERC in *TNA Merchant Projects* with a request

for the FERC to provide an explanation for its rulings "if it can" are very simple.

The first issue is whether Section 205(c) of the Act required Chehalis to file the

Interconnection Agreement as a rate schedule even though the Interconnection

Agreement does not contain any rates or charges for FERC-jurisdictional services.

The short answer to this issue is "no."

Section 205(c) of the Act requires only that documents be filed as rate

schedules at the FERC if they are "schedules showing all rates and charges for any

14

transmission or sale subject to the jurisdiction of the Commission, and the

classification, practices, and regulations affecting such rates and charges," or are

contracts which affect or relate to such rates and charges.  There is nothing in the

language of the Act, its legislative history, or FERC precedent to indicate that a

document must be filed as a rate schedule if it does not contain any rates or charges

for FERC-jurisdictional services.  Because the Interconnection Agreement does not

contain any rates or charges for FERC-jurisdictional services provided by

Chehalis, there is no requirement that it be filed as a rate schedule at the FERC.

The second issue is whether the FERC may consider a rate schedule such as

the Proposed Schedule to constitute a "rate change" that is subject to its suspension

and refund authority under Section 205(e) of the Act if an initial rate schedule

relating to the service has not previously been filed.  Again, the answer to this issue

is "no."

Under any common sense reading of the Act, the first schedule that is filed

at the FERC under which charges would be collected for a specific service would

be the "initial" rate schedule.  This Court ruled in *Middle South Energy* that an

initial rate schedule is not subject to the FERC's authority under Section 205(e) of

the Act to suspend the effectiveness of a proposed rate schedule and to require

refunds.  The FERC is seeking to have the first rate schedule filed by Chehalis for

15

the supply of reactive power treated as a rate change so that it can circumvent this limitation on its authority under the Act.

The FERC believes, erroneously, that unless the Proposed Schedule is treated as a rate change, utilities such as Chehalis may seek to obtain a strategic advantage by deferring the filing of an initial rate schedule beyond the date on which it is required to be filed. Pursuant to Section 205 of the Act, a utility may not collect <u>any</u> charges for a specified FERC-jurisdictional service until it has a rate schedule on file at the FERC authorizing it to collect such charges. Therefore, there is no incentive for a utility to defer the filing of an initial rate schedule beyond the date on which it seeks to be paid for providing the service at issue.

Although the FERC may not suspend the effectiveness of an initial rate schedule, it has authority under Section 206 of the Act to initiate an investigation into a rate schedule after it has been filed, and to order refunds of amounts collected during the period of that investigation if the existing rates are shown to be excessive or otherwise unlawful. Therefore, a regulated utility cannot circumvent the FERC's regulatory powers over FERC-jurisdictional rate schedules by engaging in a strategic withholding of a rate schedule.

## STANDING

Petitioner has been aggrieved by the orders below and has standing under Section 313 of the Act, 16 U.S.C § 825*l*. These orders violated Section 205 of the

16

Act, 16 U.S.C. § 824d, and, by depriving Petitioner of revenues to which it is entitled under its duly filed rate schedule, have caused economic harm to Petitioner that requires redress by this Court.

## ARGUMENT

### I.    The FERC's Finding That Chehalis Should Have Filed a Rate Schedule for Supplying Reactive Power to BPA Prior to May 2005 is Contrary to the Act.

The Interconnection Agreement provides for Chehalis to follow a voltage schedule established by BPA for the supply of reactive power, but does not establish rates and charges to be paid by BPA to Chehalis for doing so (R. 1 at 6, 45; R. 54 at 123).  Therefore, as Chehalis explained in its Request for Rehearing of the Remand Order (R. 94 at 11):

> When Chehalis first proposed to charge rates for reactive power, it filed its rate schedule as required by section 205(c).  Chehalis charged no rates before it filed in this case, and had no obligation under the statute to do so.  The Remand Order fails to provide any statutory basis under section 205(c) for why Chehalis should have filed any rate schedule for reactive power before it filed its rate schedule in this case.

In the Remand Order, the FERC purported to rely on the statutory language of the Act by stating correctly that "section 205 requires that <u>rates</u> for jurisdictional services must be filed with the Commission" (Remand Order at P 19; *emphasis added*); *see also*, Order on Rehearing at P 17 ("Section 205 requires that <u>rates, terms and conditions of jurisdictional services</u> must be filed with the Commission"

(*emphasis added*)).  Nevertheless, the FERC asserted in the Remand Order that "[i]f the provision of reactive power is a jurisdictional service, … then the utility providing this service has an obligation to file a rate schedule governing the provision of this service," even if the utility has not established rates for that service (Remand Order at P 19).  In so doing, the FERC unreasonably ignored the limitation on the obligation to file rate schedules in Section 205(c) of the Act to documents containing or otherwise affecting rates and charges for FERC-jurisdictional services.

A determination of whether a rate schedule for the supply of reactive power by Chehalis to BPA should have been filed prior to May 2005 must begin with an analysis of the statutory provisions applicable to any such filing.  See, e.g., *Southern California Edison Co. v. FERC,* 195 F.3d 17, 18-19 (D.C. Cir. 1999) (FERC cannot "ignore the plain terms of the statute"); *City of Anaheim v. FERC,* 558 F.3d 521 (D.C. Cir. 2009) ("we give no deference to an agency interpretation that fails to comport with the plain statutory language"); *Florida Power & Light Co. v. FERC*, 617 F.2d 809, 814-15 (D.C. Cir. 1980) (Commission's judgment cannot be sustained if it is "unreasonable or cannot be rationally reconciled with the terms of the Act").

The only documents that utilities must file at the FERC pursuant to Section 205(c) of the Act are "schedules showing all rates and charges for [FERC-

18

jurisdictional services], and the classification, practices, and regulations affecting such rates and charges," together with associated contracts.  This filing requirement enables the FERC to ensure that rates and charges for FERC-jurisdictional services are just and reasonable and not unduly discriminatory or preferential.  *See*, *Cargill Power Markets, LLC* v. *Public Service Company of New Mexico,* 141 FERC ¶ 61,141 at P 15 (2012) and cases cited therein.  There is nothing in the language of Sections 205 or 206 of the Act to suggest that a utility that may be engaged in providing a FERC-jurisdictional service is required to have a rate schedule relating to such service on file if it is not collecting any rates or charges for providing that service.

The interpretation of Section 205(c) of the Act to require the filing of specific documents as rate schedules only if such documents contain rates or charges for FERC-jurisdictional services is supported by the legislative history of the Act.  The Report of the House Committee on Interstate and Foreign Commerce which supported enactment of Parts II and III of the Act explained in pertinent part that (H. R. Rpt. No. 1318, 74th Cong., 1st Sess. at 20 (1935) (*emphasis added*)):

> Subsection (a) imposes upon public utilities the duty of charging just and reasonable rates and under the provisions of subsection (b), undue preferences or advantages are prohibited.
>
> Subsection (c) requires the filing of schedules and contracts relating to all rates and charges subject to the jurisdiction of the Commission….

19

Similarly, the report of the Senate Committee on Interstate Commerce in support of the Act summarized Sections 205(a) and 205(b) of the Act, and then noted that "Subsection (c) requires the filing with the Commission of <u>schedules showing the charges</u> for any service subject to the jurisdiction of the Commission" (S. Rep. No. 621, 74th Cong., 1st Sess. at 51 (1935); *emphasis added*).

Because the Interconnection Agreement simply establishes an obligation for Chehalis to follow voltage schedules prescribed by BPA, but does not provide for Chehalis to be compensated for meeting this obligation, Chehalis was not required to file the Interconnection Agreement (or Exhibit B) with the FERC pursuant to Section 205(c) of the Act.

## II. The FERC's Orders Finding That Chehalis Should Have Filed a Rate Schedule for Supplying Reactive Power to BPA Prior to May 2005 are Arbitrary and Capricious, and Not Supported by Substantial Evidence.

### A. The FERC Has Offered No Rational Basis for Its Orders.

The FERC's orders should also be reversed because they are not the product of reasoned decision-making. See, 5 U.S.C. § 706(2)(A); *see also, American Gas Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010). It is incumbent on the FERC to articulate "a satisfactory explanation for its action," and to demonstrate a "rational connection between the facts found and the choice made." *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636 (D.C. Cir. 2010).

The FERC has not cited anything in the language of the Act or its legislative history to suggest that a public utility may be required to file a document as a rate schedule if the document does not contain any rates or charges for FERC-jurisdictional services, or otherwise explained how its decision comports with the requirements of the Act, and Petitioner is unaware of anything that might indicate otherwise. Rather, there is a telling absence in the orders under review of any reference to any other occasion in which the FERC has found that an interconnection agreement with an uncompensated obligation to follow a voltage schedule was required to be filed by the generator as a rate schedule pursuant to Section 205 of the Act (R. 94 at 11-12). The FERC's orders therefore do not constitute reasoned decision-making. See, *Exxon Corp. v. FERC*, 206 F.3d 47, 54 (D.C. Cir. 2000) (the FERC must "cogently explain why it has exercised its discretion in [the] given manner").

The FERC has reached its conclusion that the Interconnection Agreement should have been filed as a rate schedule through an exercise of tortured logic which ignores the language of the Act. It appears that in the FERC's view: (a) the Proposed Schedule is a rate change (and therefore subject to the FERC's suspension and refund authority under Section 205(e) of the Act) because Chehalis had been supplying reactive power to BPA since 2003; (b) if the Proposed Schedule is a rate change, there must have been an initial rate schedule that was

21

required to be filed; (c) the only possible prior rate schedule for the supply of reactive power by Chehalis was the Interconnection Agreement; so therefore (d) the Interconnection Agreement must be a rate schedule that was required to be filed pursuant to Section 205(c) of the Act (Remand Order at P 19; Order on Rehearing at P 19).

This analysis overlooks the fact that the Interconnection Agreement is void of any rates and charges for the supply of reactive power, and therefore does not constitute a rate schedule under Section 205 of the Act. The FERC's statement that Chehalis should have filed an earlier rate schedule for its uncompensated obligation to provide reactive power to BPA is not supported by any language in the Act or by a single citation to any regulation or judicial or Commission precedent. In the absence of any such precedent, the FERC's conclusion cannot be deemed to be the product of reasoned decision-making.

The FERC attempted to discredit the distinction drawn by Chehalis between an uncompensated obligation to provide reactive power service, such as that incorporated in the Interconnection Agreement, and a rate schedule establishing rates and charges for a FERC-jurisdictional service, by claiming that "Chehalis's choice of words for describing its arrangement with Bonneville does not control what is and what is not a rate" (Order on Rehearing at P 19). Chehalis does not

contend otherwise.  Instead, the distinction between what is and what is not a rate schedule must be based on the provisions of Sections 205 and 206 of the Act.

For reasons discussed above, a rate schedule that is required by Section 205(c) of the Act to be filed at the FERC is a document that establishes rates and charges for FERC-jurisdictional services.  There is <u>absolutely nothing</u> in the Act, the legislative history of the Act, or the FERC's prior orders implementing the Act to suggest that a rate schedule may exist for FERC-jurisdictional services when there is no compensation being collected for that service.

Although the Interconnection Agreement obligates Chehalis to supply reactive power to BPA, it does not prescribe any compensation for this service (*see*, Exhibit B (R. 54 at 123)).  The total absence of any language in the Interconnection Agreement that might affect or relate to rates and charges for reactive power supplied by Chehalis precludes it from being treated as a rate schedule that was required to be filed pursuant to Section 205(c) of the Act.

Having failed to demonstrate that the Interconnection Agreement is required by Section 205(c) of the Act to be filed as a rate schedule, the FERC has attempted to imply that Chehalis somehow conceded that it was required to file the Interconnection Agreement as a rate schedule because it filed the Proposed Schedule as a rate schedule (Remand Order at P 19; Order on Rehearing at PP 19, 21-22).  This claim is not supported by the record.  Chehalis noted when it

23

filed the Proposed Schedule that "[t]he reactive power service that is the subject of the submitted rates is a new service offered by Chehalis in that it has never sought to charge for this service before" (R. 1 at 6). Chehalis subsequently explained in its Request for Rehearing of the Remand Order that it although it had filed the Proposed Schedule as a rate schedule, the Interconnection Agreement had not similarly been filed as a rate schedule because "Chehalis merely had an uncompensated obligation in an interconnection agreement to follow a voltage schedule" (R. 94 at 11).

The fact that Chehalis filed the Proposed Schedule in order to be able to charge rates for reactive power does not show that the Interconnection Agreement should also have been filed as a rate schedule. The Interconnection Agreement, which sets forth the obligation for Chehalis to follow voltage schedules established by BPA, and the Proposed Schedule are separate and distinct. The provisions in Exhibit B, under which Chehalis is obligated to follow voltage schedules established by BPA (R. 54 at 123), are not incorporated in the Proposed Schedule (R. 1 at 10-11) and have not otherwise been filed by Chehalis as part of any rate schedule. It is therefore evident that there is no basis for the FERC's claim that the Interconnection Agreement should have been filed as a rate schedule simply because Chehalis had filed the Proposed Schedule as a rate schedule.

24

Moreover, the FERC's claim that the Interconnection Agreement was required to be filed by Chehalis as a rate schedule is inconsistent with the FERC's own prior actions. The FERC was aware as a result of the Settlement Agreement that Chehalis had an uncompensated obligation in the Interconnection Agreement to provide reactive power to BPA (R. 1 at 3, 26-27). Nevertheless, the FERC accepted that Settlement Agreement, which provided for the filing of the Proposed Schedule as an initial rate schedule, without conditions or modifications. *TransAlta Centralia Generation, LLC,* 111 FERC ¶ 61,087 (2005). The FERC presumably would not have accepted the Settlement Agreement, which authorized Chehalis to submit an initial rate schedule to establish rates and charges for reactive supply service prospectively, if the pre-existing Interconnection Agreement was deemed to be the initial rate schedule for this service.

**B.    The FERC Has Departed From Precedent Without Reasoned Explanation.**

Insofar as Chehalis is aware, the FERC has never previously suggested that a utility with an obligation to supply reactive power to the transmission provider with which it is interconnected without compensation is required to file a rate schedule for such service. Under such circumstances, it was incumbent on the FERC to provide a reasonable explanation of why its change of policy is appropriate. See, *ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) ("[W]here an agency departs from established precedent without a reasoned

25

explanation, its decision will be vacated as arbitrary and capricious."); *see also,*

*Nat'l Fed'n of Fed. Employees, FD-1 v. Fed. Labor Relations Auth.*, 412

F.3d 119, 124 (D.C. Cir. 2005) (an agency "must either follow its own precedent or

'provide a reasoned explanation for' its decision to depart from that precedent"

(citation omitted)); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852

(D.C. Cir. 1970) (agencies departing from their own precedent must "supply a

reasoned analysis indicating that prior policies and standards are being deliberately

changed, not casually ignored").  It is thus well recognized that an unreasonably

explained "departure from precedent must be overturned as arbitrary and

capricious," and that an agency's "failure to come to grips with conflicting

precedent constitutes an inexcusable departure from the essential requirement of

reasoned decision making."  *Moshea v. NTSB*, 570 F.3d 349, 352 (D.C. Cir. 2009)

(citations omitted).

     In 1993, the FERC conducted a comprehensive review of Section 205 of the

Act, its legislative history, and prior FERC orders implementing its provisions in

order to ascertain the scope of documents that are required to be filed as rate

schedules.  See, *Prior Notice and Filing Requirements Under Part II of the*

*Federal Power Act*, 64 FERC ¶ 61,139 (1993) ("*Prior Notice*").  Based on its

analysis, the FERC noted repeatedly in the Appendix to *Prior Notice* that the only

documents required to be filed as rate schedules are documents setting forth rates and charges for FERC-jurisdictional services:

> …the Commission may require any matter that forms any significant part of the calculation of the rate customers actually pay for jurisdictional service to be filed for Commission review.  [64 FERC at 61,988]

> \*   \*   \*

> In general, the question of our jurisdiction over a particular contract depends on whether the contract contains a rate or charge for or in connection with the transmission or sale of electric energy in interstate commerce, or whether the contract affects or relates to such rates or service. [64 FERC at 61,990].

> \*   \*   \*

> … in order to come within our purview, the agreement must contain a charge connected to jurisdictional service  [64 FERC at 61,991].

Although Section 9.6.2 of the standard LGIA contains reactive power obligations comparable to those in Exhibit B, the FERC has never required generators to file a rate schedule for supplying reactive power when they are not being compensated for that service (R. 94 at 12).  Instead, each generator is required by Section 11.6 of the standard LGIA to file a separate rate schedule if it wants to be compensated for supplying reactive power (68 Fed. Reg. at 49,964). The orders below reverse the FERC's well-established policy as articulated in *Prior Notice* with no explanation of why a change in policy is warranted and consistent with the requirements of the Act.

27

Not only is there no legal precedent or authority supporting the FERC's conclusion that an uncompensated obligation to follow a voltage schedule must be filed as a rate schedule, there is in fact FERC precedent holding <u>precisely the opposite.</u> In Order No. 2003, the FERC ruled that since the generator "is only meeting its obligation" to provide reactive power, transmission providers would not be required to compensate generation owners for providing reactive power within an established power factor range unless the transmission provider was also compensating its own generators for providing reactive power within the specified power factor range (68 Fed. Reg. at 49,891 (P 546)). The FERC subsequently ruled that the right of an independent generator to be compensated for supplying reactive power within the dead band to the transmission provider with which it was interconnected depended on whether the transmission provider was compensating its own generators for providing this service. Order No. 2003-A, 69 Fed. Reg. at 15,964 (P 416).

Chehalis was affiliated with Hot Spring Power Company, another independent generator. See, *Hot Spring Power Company, LP,* 110 FERC ¶ 61,284 at PP 3, 5 (2005). Based on the determination in Order No. 2003 conditioning the eligibility of independent generators providing reactive power service within the dead band to be compensated for that service, the FERC ordered Hot Spring Power to cancel an existing rate schedule for reactive power service after the utility

28

owning the transmission facilities to which it was interconnected ceased paying its own generators for reactive power "inside the dead band."  *Hot Spring Power Company, L.P.,* 113 FERC ¶ 61,088 at P 14 (2005); *order on rehearing*, 115 FERC ¶ 61,027 (2006) ("*Hot Spring*").

There was no mention in *Hot Spring* of any obligation for the generator to retain a rate schedule for uncompensated reactive power service on file with the FERC.  Instead, the rate schedule was required to be cancelled and eliminated as of November 1, 2005, when the transmission provider to which the generator was interconnected discontinued paying its own generators for reactive power (*id*.) ("Hot Spring Power must file to remove the subject rate schedule from its tariff effective November 1, 2005").

In compliance with *Hot Spring*, Hot Spring Power and certain other independent generators cancelled their existing reactive power rate schedules.  The FERC accepted those cancellations without suggesting in any way that the rate schedules were required to be replaced with schedules under which reactive power service within the dead band was to be supplied without compensation.  *KGen Hinds LLC,* 122 FERC ¶ 61,269 (2008); *see also*, *Calpine Construction Finance Company, L.P.,* 130 FERC ¶ 61,080 (2010).

In the Order on Rehearing, the FERC sought to distinguish the proceeding below from that under consideration in *Hot Spring* on the basis of its claim that

29

"the Hot Spring generator at issue in that case was not yet operating" (Order on

Rehearing at P 20).  The order in *Hot Spring* shows, to the contrary, that the first

gas turbine unit of Hot Spring Power's facility began commercial operation on

July 5, 2005 (113 FERC ¶ 61,088 at P 3), and that Hot Spring Power was permitted

to collect charges for reactive power service supplied from that unit pursuant to the

rate schedule it had filed in that proceeding from September 1, 2005 (when its rate

schedule became effective) through October 31, 2005 (113 FERC ¶ 61,088 at PP

11, 14; *see also, Hot Spring Power Company*, 116 FERC ¶ 61,223 at P 6 (2006)).

The FERC also sought to distinguish the cases cited by Chehalis in which

generators' rate schedules relating to reactive power had been cancelled or rejected

from the proceeding below on the basis that "the generators all had filed rates" for

reactive power service (Order on Rehearing at P 20).  However, the cancellation of

the rate schedules did not relieve the generators of the obligation under their

respective interconnection agreements to provide reactive power to the

transmission provider.  Therefore, although the generators continued to provide

reactive power to the transmission provider, they were required to do so without

having a rate schedule for that service on file at the FERC.

Although the FERC claimed that the case at issue in *Hot Spring Power* "is

very different from this one" (Order on Rehearing at P 20), it has not identified any

material differences between the circumstances at issue in each order.  It is totally

30

illogical for the FERC to claim that Chehalis should have filed a rate schedule for reactive power service prior to May 2005, even though it had not proposed any rates for that service, but to require an affiliated generator to cancel and remove its rate schedule for reactive power service when it was no longer entitled to be compensated for that service.

Chehalis pointed out in its Request for Rehearing of the Remand Order that "Section 9.6.2 of the LGIA contains reactive power obligations comparable to what is in the BPA interconnection Agreement, but the Commission has never required the generator to file the LGIA" (R. 94 at 17). In the Order on Rehearing, the FERC explicitly declined to address this inconsistent treatment of other generators (Order on Rehearing at P 24). The FERC's failure to reconcile its treatment of other generators with uncompensated obligations to supply reactive power with its claim that the Interconnection Agreement should have been filed as a rate schedule by Chehalis undermines its conclusion that Chehalis was required to have filed the Interconnection Agreement as a rate schedule.

### III. The FERC's Orders Finding That the Proposed Schedule is a Rate Change Even Though Chehalis Did Not Have a Filed Rate Schedule for Supplying Reactive Power Prior to May 2005 are Unreasonable and Contrary to the Act.

As discussed above, Chehalis did not file a rate schedule with the FERC pursuant to which it might be compensated for supplying reactive power until May 2005 (R. 1 at 6, 45). The FERC claims in the Remand Order that the lack of an

31

effective rate schedule for supplying reactive power service prior to that time "did not convert the subsequent changed rate at issue here into an initial rate" (Remand Order at P 20).  Although the FERC has attempted to justify this conclusion, the rationales it has proffered are illogical and inconsistent with the Act.

First, the FERC stated without explanation that to rule that the Proposed Schedule was not a rate change simply because there was no previously-filed rate schedule on file for reactive power service by Chehalis "would elevate form over substance" (Remand Order at P 20).  However, it is uncontroverted that the Interconnection Agreement was not filed by Chehalis as a rate schedule because it lacks rates and charges for the supply of reactive power by Chehalis (R. 94 at 11). A document is not a rate schedule that is required to be filed with the FERC pursuant to Section 205(c) of the Act unless it establishes rates and charges for a FERC-jurisdictional service (*see*, pp. 17-20, 26-27, *supra*).  Therefore, the Interconnection Agreement lacks an essential characteristic of any rate schedule. For that reason, as a matter of substance, there was no initial rate schedule for supply of reactive power by Chehalis (filed or unfiled) to be changed by the Proposed Schedule.

The Court in *Middle South Energy* recognized that the phrase "such new schedules" in Section 205(e) of the Act refers only to changed rates, and that the use of the common-sense meaning of the word "change" excludes initial rate

32

schedules.  The FERC's claim that a rate schedule might be considered to be a changed rate even though there was not a previously-filed initial rate schedule for the service at issue is contrary to the common-sense interpretation of the Act adopted by the Court in *Middle South Energy*.

Second, the FERC hypothesizes that (Remand Order at P 20):

> If Chehalis's argument were accepted, service providers would have an incentive not to file rate schedules (which, after all, is a statutory requirement and not an option) until it is in their interest to do so, e.g., when they propose a significant increase in rates, because by delaying they could avoid suspension of the increase in rates.

The FERC further asserted in the Order on Rehearing that if the first rate schedule filed by a public utility for a particular service is deemed to be an initial rate schedule, the utility may somehow be able to escape regulatory scrutiny (Order on Rehearing at P 24):

> … to make a definition of what is or is not a changed rate depend on whether a utility has, in fact, filed a previous rate schedule—even if it was required to file by the Federal Power Act, but did not file—leaves the application of the statute largely in the hands of the utility.  A utility could then engage in the kind of conduct that, as discussed in our earlier order, would insulate it from the regulatory oversight and ratepayer protections provided by section 205.

This suggestion is irrational, speculative, and wholly without foundation. There is no evidence in the record to suggest that Chehalis or any other generator has deferred the filing of a rate schedule which was required to be filed in order to obtain some strategic advantage.

33

Significantly, regulated utilities such as Chehalis may not collect <u>any</u> charge for FERC-jurisdictional services such as the supply of reactive power unless and until they have rate schedules for such services on file with the FERC.  (See, e.g., *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.,* 341 U.S. 246 (1951) ( a utility "can claim no rate as a legal right that is other than the filed rate"); *see also*, *Prior Notice,* 64 FERC at 61,979-980.  The FERC ruled in *Central Hudson Gas & Electric Corp.,* 60 FERC ¶ 61,106, *reh'g denied,* 61 FERC ¶ 61,106 (1992), that it would not grant a waiver of this requirement for a rate schedule filing that involves a new service absent a strong showing of good cause.

Therefore, each electric utility has a strong incentive to file an initial rate schedule whenever it desires to begin collecting charges for a FERC-jurisdictional service.  Once the initial rate schedule has been accepted for filing by the FERC and permitted to become effective, a subsequent increase in rates would be a rate change that is subject to the FERC's suspension and refund authority under Section 205(e) of the Act.

Moreover, a utility may not easily evade regulatory oversight by the FERC in the manner contemplated by the FERC.  Section 206 of the Act permits the FERC to investigate the lawfulness of existing filed rates for FERC-jurisdictional services.  Section 206(b) of the Act further provides that whenever such an investigation is initiated, the FERC may provide that charges collected under the

34

rates at issue will be subject to refund if, at the conclusion of the investigation, they

are found to be excessive:

> Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date.… At the conclusion of any proceeding under this section, the Commission may order the public utility to make refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge classification, rule, regulation, practice or contract which the Commission orders to be thereafter observed and in force.

Although the FERC lacks the statutory authority under Section 205 of the

Act to order refunds of amounts collected for the supply of reactive power service

to BPA after the Proposed Schedule became effective, it could have instituted an

investigation into the Proposed Schedule pursuant to Section 206 of the Act. If the

FERC had done so, the period during which the charges being collected by

Chehalis were not subject to a potential refund obligation would have been

extremely short. It is thus evident that a public utility may not, by delaying the

filing of an initial rate schedule, insulate itself from the regulatory oversight and

ratepayer protections of the FERC for any significant period of time, as the FERC

has implied.

In *Middle South Energy*, the FERC similarly raised the specter that unless

Section 205 of the Federal Power Act was interpreted to permit it to suspend the

effectiveness of initial rate schedules, "utilities will be able to charge unreasonable

35

initial rates with impunity, and will retain the unlawful proceeds even after the

Commission has ordered them to cease charging the unlawful rate" (*Middle South*

*Energy*, 747 F.2d at 771).  However, the Court properly dismissed this concern on

the basis that "the 'gap' the Commission asks us to rectify falls far short of being

an 'absurd result' that would support our straining the statute's language to find its

sense."

        For similar reasons, there is no basis for the FERC's claim in this proceeding

that a utility might be able to insulate itself from the regulatory oversight and

ratepayer protections under Sections 205 and 206 of the Act by delaying the filing

of an initial rate schedule.  Especially since the FERC has authority to order

refunds of amounts collected pursuant to initial rate schedules that are found to be

unlawful at the conclusion of an investigation pursuant to Section 206 of the Act,

there is no significant incentive for a public utility to engage in strategic

withholding of a filing until the most opportune moment, as hypothesized by the

FERC (Order on Rehearing at P 25).

        In any event, Congress provided in the Act that a rate schedule is a

document that establishes or relates to rates and charges for FERC-jurisdictional

services.  As this Court determined in *Middle South Energy*, Congress withheld

from the FERC the authority to suspend the effectiveness of an initial rate schedule

and order refunds thereafter.  Any concerns that the FERC may have with the

36

possibility that a utility may be able to derive a strategic advantage under this regulatory scheme should be addressed by the Congress (*Middle South Energy*, 747 F.2d at 771).

Third, the FERC explained that (Remand Order at P 20):

> … as a customer, not a provider, of the service that is the subject of this dispute, Bonneville did not have an obligation to file the stand-alone rate schedule for the provision of reactive power that Chehalis has filed.

While true, this statement is wholly irrelevant. Because the Interconnection Agreement did not establish rates and charges for the supply of reactive power to BPA, Chehalis also had no obligation to file the Interconnection Agreement (or Exhibit B thereto) as a stand-alone rate schedule for the provision of reactive power. When Chehalis sought to be compensated for supplying reactive power to BPA, Chehalis (not BPA) filed a stand-alone rate schedule as an initial rate schedule in accordance with Section 205 of the Federal Power Act and the Settlement Agreement. The mere fact that BPA had no obligation to file either the Interconnection Agreement or a stand-alone rate schedule for the provision of reactive power from the Chehalis Plant did not impose an obligation on Chehalis to have a rate schedule for the supply of reactive power to BPA on file with the FERC prior to May 31, 2005.

## CONCLUSION

For the reasons set forth herein, the Court should grant the Petition for

Review and reverse the orders of the FERC in the case below.  The Court should

also order such further action and relief as necessary to place Chehalis in the

position it would have been if the FERC had not acted unlawfully in the case

below.

Respectfully submitted,

*James K. Mitchell*

James K. Mitchell
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006
Telephone: (202) 973-4241
Facsimile: (202) 973-4441
E-Mail: jamesmitchell@dwt.com

Counsel for TNA Merchant Projects, Inc.
Successor-in-interest to Chehalis Power
Generating, LLC

DATED:  April 15, 2013

38

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure and

Circuit Rule 32(a)(2), I hereby certify that the textual portion of the foregoing brief

(exclusive of the disclosure statement, tables of contents and authorities, glossary,

certificates of service and compliance) contains 9,226 words as determined by the

word-counting feature of Microsoft Word 2010.

_James K. Mitchell_

Opening Brief:  Filed April 15, 2013

**ADDENDUM**

SECTION 205 OF THE FEDERAL POWER ACT; 16 USC § 824D - RATES
AND CHARGES; SCHEDULES; SUSPENSION OF NEW RATES;
AUTOMATIC ADJUSTMENT CLAUSES

**(a) Just and reasonable rates**
All rates and charges made, demanded, or received by any public utility for or in
connection with the transmission or sale of electric energy subject to the
jurisdiction of the Commission, and all rules and regulations affecting or pertaining
to such rates or charges shall be just and reasonable, and any such rate or charge
that is not just and reasonable is hereby declared to be unlawful.

**(b) Preference or advantage unlawful**
No public utility shall, with respect to any transmission or sale subject to the
jurisdiction of the Commission,

**(1)** make or grant any undue preference or advantage to any person or subject
any person to any undue prejudice or disadvantage, or

**(2)** maintain any unreasonable difference in rates, charges, service, facilities,
or in any other respect, either as between localities or as between classes of
service.

**(c) Schedules**
Under such rules and regulations as the Commission may prescribe, every public
utility shall file with the Commission, within such time and in such form as the
Commission may designate, and shall keep open in convenient form and place for
public inspection schedules showing all rates and charges for any transmission or
sale subject to the jurisdiction of the Commission, and the classifications,
practices, and regulations affecting such rates and charges, together with all
contracts which in any manner affect or relate to such rates, charges,
classifications, and services.

**(d) Notice required for rate changes**
Unless the Commission otherwise orders, no change shall be made by any public
utility in any such rate, charge, classification, or service, or in any rule, regulation,
or contract relating thereto, except after sixty days' notice to the Commission and
to the public. Such notice shall be given by filing with the Commission and
keeping open for public inspection new schedules stating plainly the change or
changes to be made in the schedule or schedules then in force and the time when
the change or changes will go into effect. The Commission, for good cause shown,
may allow changes to take effect without requiring the sixty days' notice herein

provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

**(e) Suspension of new rates; hearings; five-month period**

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective. If the proceeding has not been concluded and an order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**(f) Review of automatic adjustment clauses and public utility practices; action by Commission; "automatic adjustment clause" defined**

**(1)**  Not later than 2 years after November 9, 1978, and not less often than every 4 years thereafter, the Commission shall make a thorough review of automatic adjustment clauses in public utility rate schedules to examine—

**(A)**  whether or not each such clause effectively provides incentives for efficient use of resources (including economical purchase and use of fuel and electric energy), and

**(B)** whether any such clause reflects any costs other than costs which are—

**(i)** subject to periodic fluctuations and

**(ii)** not susceptible to precise determinations in rate cases prior to the time such costs are incurred.

Such review may take place in individual rate proceedings or in generic or other separate proceedings applicable to one or more utilities.

**(2)** Not less frequently than every 2 years, in rate proceedings or in generic or other separate proceedings, the Commission shall review, with respect to each public utility, practices under any automatic adjustment clauses of such utility to insure efficient use of resources (including economical purchase and use of fuel and electric energy) under such clauses.

**(3)** The Commission may, on its own motion or upon complaint, after an opportunity for an evidentiary hearing, order a public utility to—

**(A)** modify the terms and provisions of any automatic adjustment clause, or
**(B)** cease any practice in connection with the clause,
if such clause or practice does not result in the economical purchase and use of fuel, electric energy, or other items, the cost of which is included in any rate schedule under an automatic adjustment clause.

**(4)** As used in this subsection, the term "automatic adjustment clause" means a provision of a rate schedule which provides for increases or decreases (or both), without prior hearing, in rates reflecting increases or decreases (or both) in costs incurred by an electric utility. Such term does not include any rate which takes effect subject to refund and subject to a later determination of the appropriate amount of such rate.

SECTION 206 OF THE FEDERAL POWER ACT; 16 USC § 824E - POWER OF
COMMISSION TO FIX RATES AND CHARGES; DETERMINATION OF
COST OF PRODUCTION OR TRANSMISSION

**(a) Unjust or preferential rates, etc.; statement of reasons for changes;
hearing; specification of issues**

Whenever the Commission, after a hearing held upon its own motion or upon
complaint, shall find that any rate, charge, or classification, demanded, observed,
charged, or collected by any public utility for any transmission or sale subject to
the jurisdiction of the Commission, or that any rule, regulation, practice, or
contract affecting such rate, charge, or classification is unjust, unreasonable,
unduly discriminatory or preferential, the Commission shall determine the just and
reasonable rate, charge, classification, rule, regulation, practice, or contract to be
thereafter observed and in force, and shall fix the same by order. Any complaint or
motion of the Commission to initiate a proceeding under this section shall state the
change or changes to be made in the rate, charge, classification, rule, regulation,
practice, or contract then in force, and the reasons for any proposed change or
changes therein. If, after review of any motion or complaint and answer, the
Commission shall decide to hold a hearing, it shall fix by order the time and place
of such hearing and shall specify the issues to be adjudicated.

**(b) Refund effective date; preferential proceedings; statement of reasons for
delay; burden of proof; scope of refund order; refund orders in cases of
dilatory behavior; interest**

Whenever the Commission institutes a proceeding under this section, the
Commission shall establish a refund effective date. In the case of a proceeding
instituted on complaint, the refund effective date shall not be earlier than the date
of the filing of such complaint nor later than 5 months after the filing of such
complaint. In the case of a proceeding instituted by the Commission on its own
motion, the refund effective date shall not be earlier than the date of the publication
by the Commission of notice of its intention to initiate such proceeding nor later
than 5 months after the publication date. Upon institution of a proceeding under
this section, the Commission shall give to the decision of such proceeding the same
preference as provided under section 824d of this title and otherwise act as
speedily as possible. If no final decision is rendered by the conclusion of the 180-
day period commencing upon initiation of a proceeding pursuant to this section,
the Commission shall state the reasons why it has failed to do so and shall state its
best estimate as to when it reasonably expects to make such decision. In any
proceeding under this section, the burden of proof to show that any rate, charge,
classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly

discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

**(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined**
Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that

**(1)** requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and
**(2)** is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.

**(d) Investigation of costs**
The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper

conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

**(e)  Short-term sales**
**(1)**  In this subsection:

    **(A)**    The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).
    **(B)**    The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

**(2)**  If an entity described in section 824 (f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

**(3)**  This section shall not apply to—
    **(A)**    any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or
    **(B)**    an electric cooperative.

**(4) (A)**    The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

    **(B)**    The Commission may order a refund under subparagraph (A) only for short-term sales made by the Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

**(C)** In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

## CERTIFICATE OF SERVICE

Pursuant to Rule 23 of the Federal Rules of Appellate Procedure, I hereby

certify that two copies of the foregoing Brief have been served this 15th day of

April, 2013 by first-class mail, postage prepaid, upon the following persons:

Robert H. Solomon
Solicitor
Samuel Soopper
Federal Energy Regulatory Commission
888 First Street, NE, Room 91-01
Washington, DC 20426

Jeffrey Allen Clair
U.S. Department of Justice
Civil Division/Appellate Staff
950 Pennsylvania Ave., NW, Room 7243
Washington, DC 20530

Barbara C. Biddle
U.S. Department of Justice
Civil Division/Appellate Staff
950 Pennsylvania Ave., NW, Room 7243
Washington, DC 20530

James K. Mitchell
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20006-3401
(202) 973-4241